1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

KAMAL A. SEFELDEEN,

             Petitioner,

v.

ROBERT AYERS, JR., Warden,

             Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. C 07-01289 SBA (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

## **INTRODUCTION**

    Petitioner Kamal A. Sefeldeen, an inmate at San Quentin State Prison, filed this pro se petition seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, to challenge the denial of his parole suitability by the California Board of Prison Terms (BPT) in 2004.[1]  The matter is now submitted for the Court's consideration of the merits of the petition.  For the reasons discussed below, the petition is DENIED.

## **PROCEDURAL BACKGROUND**

    On September 3, 1987, Petitioner was sentenced to twenty-five years to life in state prison for first degree murder with a firearm, plus five years for assault with a firearm.  (Resp't Ex. 1 at 2.)  On December 2, 2004, the BPT conducted an initial parole consideration hearing.  (Resp't Ex. 3.)  After the hearing, the BPT concluded that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  (Id.)  Consequently, Petitioner was denied parole for four years.  (Id.)

    Following his parole denial, Petitioner sought habeas relief in state court.  He filed a petition for writ of habeas corpus in the Santa Clara County Superior Court on February 21, 2006.  (Pet.

---

    [1] The BPT was abolished effective on July 1, 2005 and replaced with the California Board of Parole Hearings.  Cal. Penal Code § 5075(a).  The Court will continue to use "BPT" to denote the past actions of the Board of Parole Hearings, the real party in interest.

Attach. 3.)  In his state petition, Petitioner raised three claims, alleging that the BPT found him unsuitable for parole in violation of his due process rights.  (Id.)  The superior court denied the petition in a two-page order filed on May 19, 2006.  (Resp't Ex. 2.)  Petitioner subsequently filed a state habeas petition in the California Court of Appeal.  (Pet. Attach. 4.)  Petitioner's state appellate court petition added a fourth claim to the original three claims he previously raised in his state superior court petition.  The California Court of Appeal summarily denied his state habeas petition on June 26, 2006.  (Id.)  Thereafter, Petitioner filed a state habeas petition in the California Supreme Court.  The state supreme court summarily denied his petition on February 7, 2007.  (Pet. Attach. 5.)

Petitioner filed the instant federal habeas petition on March 6, 2007.  He alleges that by denying him parole at his initial parole consideration hearing, the BPT violated his due process rights by not supporting its denial by "some evidence," specifically by: (1) preventing him from hearing the tape-recorded statement from the victim's father and failing to provide Petitioner with a transcript of the tape-recorded statement before the hearing (Claim One); (2) allowing statements from the victim's next of kin beyond that permitted under California Penal Code § 3043.2 (Claim Two); and (3) requiring Petitioner to submit parole plans in the United States contrary to federal law regarding his deportation (Claim Three).  Petitioner also alleges that the state court abused its discretion by failing to address his constitutional claims on the merits and by circumventing his request for a new parole suitability hearing based on the BPT's violation of his due process rights (Claim Four).  On May 21, 2007, the Court issued an order to show cause.

On July 17, 2007, Respondent filed a motion to dismiss in lieu of filing an Answer to Petitioner's federal habeas petition.  Petitioner opposed the motion, and Respondent filed a reply to the opposition.

On March 31, 2008, the Court granted in part and denied in part Respondent's motion to dismiss.  The Court denied the motion to dismiss as to his first two due process claims (Claims One and Two) upon finding that Petitioner had a liberty interest in parole.  (Mar. 31, 2008 Order at 5.)  The Court now liberally construes these due process claims to allege that the BPT's 2004 denial of parole was not supported by some evidence.  The Court granted the motion to dismiss as to Claim

2

Three upon finding that parole plans were "not at issue" and that the BPT did not deny parole based on Petitioner's failure to submit parole plans in the United States. (Id. at 6.) Finally, the Court granted Respondent's motion to dismiss as to Claim Four upon finding that Petitioner failed to exhaust his claim that the state courts abused their discretion by failing to address Petitioner's constitutional claims on the merits. (Id. at 8-9.) The Court ordered Petitioner to file an amended petition that included only his exhausted claims or to request a stay while he exhausted his unexhausted claim in state court. (Id. at 9.)

On April 28, 2008, Petitioner filed his first amended petition, which includes on Claims One and Two. The Court issued a second order to show cause. On August 3, 2009, Respondent filed an Answer. On October 6, 2009, Petitioner filed a Traverse. The Court will proceed to consider the merits of Petitioner's due process claims relating to the BPT's 2004 denial.

## STANDARD OF REVIEW

### I. AEDPA

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004), cert. denied, 546 U.S. 963 (2005). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

3

**A.      Review of Parole Suitability Decisions**

Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006); Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); see also McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review under § 2254 applies to such decisions).

**B.      Section 2254(d)(1)**

Challenges to purely legal questions resolved by the state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards.  See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds; Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

**1.      Clearly Established Federal Law**

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether

constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

### 2. "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Id. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

### 3. "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord

Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The "objectively unreasonable" standard is not a clear error standard. Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point). After Andrade, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." Id. In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

**C.      Section 2254(d)(2)**

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to the petitioner's claim, that was properly presented and made part of the state court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II.     Exhaustion

Prisoners in state custody who wish to challenge collaterally in federal habeas corpus proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987). It is undisputed that Petitioner exhausted his state court remedies as to the due process claims raised in his amended petition.

## FACTUAL BACKGROUND

Although Petitioner is not challenging the validity of his underlying criminal conviction, the facts regarding the commitment offense were relied upon by the BPT to deny Petitioner parole in 2004. The facts regarding the circumstances surrounding the murder of Debra Louise Sefeldeen, Petitioner's wife, were read into the record at the hearing. The Court includes that summary here:

> On the evening of December 9, 1985, with a rifle in his possession [Petitioner] proceeded to San Juan Batista in an effort to obtain custody of his son. Upon arrival at the Butcher's residence, [Petitioner] noted that the victim's vehicle was not in the driveway and left. At approximately 10:00 p.m. he arrived at the victim's place of employment . . . . [Petitioner] waited outside for the victim to exit. Upon exiting the front door, the victim proceeded around the corner of the building, and [Petitioner] confronted her. The victim was heard to scream repeatedly and seconds later was seen running toward the front of the school with

[Petitioner] following closely behind. When she got to the door, a shot was heard. The victim [sic], Kinsley Ronald Jillie, had been seated in his parked vehicle when he heard the victim's screams. I think that may have meant witness. In an attempt to rescue her, Jillie ran toward [Petitioner] yelling at him to stop. [Petitioner] reacted by turning and momentarily pointing the rifle at Jillie which caused Jillie to stop 10 to 20 feet from the [Petitioner]. Jillie ran off, and [Petitioner] resumed firing the weapon at Victim [Debra] Sefeldeen from a distance of five feet. [Petitioner] was then observed to fire the .3030 caliber rifle, purchased earlier that same day, at the victim four additional times. After the shooting, [Petitioner] walked into the school lobby with gun in hand and told witnesses to call the police. He then went back outside. A man walking his dog walked past the scene and was told by [Petitioner] to please go away. I just killed my wife. [Petitioner] was then observed leaning on the trunk of the vehicle as if waiting for the police. Upon their arrival, the victim was pronounced dead, and [Petitioner] was arrested.

(Resp't Ex. 3 at 14:25-16:25 [brackets added].)

## DISCUSSION

### I.    Protected Liberty Interest

As a threshold matter, Respondent appears to argue again that Petitioner's claims should be dismissed for lack of subject matter jurisdiction on the ground that he has no federally protected liberty interest in parole. (Answer at 3.) This Court previously rejected this argument in its March 31, 2008 Order denying Respondent's motion to dismiss as to Claims One and Two, the Court previously found that it has subject matter jurisdiction under 28 U.S.C. § 2254 to decide whether Petitioner's right to due process was violated by the BPT. (Mar. 31, 2008 Order at 5.) In addition, as Respondent concedes, his argument has been rejected by the Ninth Circuit. See Sass, 461 F.3d at 1125 ("California inmates continue to have a liberty interest in parole after In re Dannenberg."). Thus, under Sass, Petitioner was entitled to the protections of due process at his 2004 parole suitability hearing.

### II.   Mootness

Respondent argues that Petitioner's claims are moot because the BPT conducted another parole suitability hearing on March 2, 2009, at which the victim's father's testimony was presented. (Answer at 11-12.) At the 2009 hearing, Petitioner was denied parole for seven years. (Resp't Ex. 4.)

8

The case or controversy requirement of Article III of the United States Constitution deprives a court of jurisdiction to hear moot cases. Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983). To satisfy the Article III case or controversy requirement, the petitioner "must have suffered, or be threatened with an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990). The party asserting mootness bears the burden of establishing that there is no "effective relief" remaining that the court could provide. S. Oreg. Barter Fair v. Jackson County, 372 F.3d 1128, 1134 (9th Cir. 2004).

The present action challenging the BPT's 2004 decision is not rendered moot by the BPT's subsequent 2009 parole suitability hearing. The alleged injury -- a constitutionally deficient parole suitability hearing -- can be redressed effectively with a new hearing. While Petitioner had a subsequent parole suitability hearing in 2009, he nonetheless was found to be unsuitable for parole at that hearing and he is still in custody. The present petition challenging the BPT's 2004 denial has not lost its character as a present, live controversy because the alleged injury can be redressed by a favorable judicial decision. If the Court were to grant the instant petition, it would remand this case to the BPT to evaluate Petitioner's suitability for parole in accordance with due process of law and retain jurisdiction to enforce its order. The BPT would re-evaluate Petitioner's suitability for parole. Even if the BPT found Petitioner suitable for parole, the governor could reverse the BPT's suitability finding. At that point, the Court could review and overturn the governor's reversal, if appropriate. Accordingly, the Court finds no merit to Respondent's argument that Petitioner's claims stemming from BPT's 2004 denial are moot.

**III.    Due Process Claims**

    **A.    Legal Standard**

"In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look at two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards." Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003). The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole. See Sass, 461 F.3d at 1129 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. Id. at 1128 (quoting Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Hill, 472 U.S. at 457). The some evidence standard of Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

Three Ninth Circuit cases provide the guideposts for applying Hill's "some evidence" standard on this point: Biggs, Sass, and Irons v. Carey, 505 F.3d 846, 850 (9th Cir.), reh'g and reh'g en banc denied, 506 F.3d 951 (9th Cir. 2007). Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered . . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of

Biggs's offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916.

In Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner sixteen years into his seventeen-to-life sentence.

Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853. Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a fifteen-to-life sentence.

The upshot of these three cases is that the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and <u>Irons</u>).  <u>Sass</u> did not undermine the principle that, all things being equal, a murder committed fifty years ago is less probative of a prisoner's current dangerousness than one committed ten years ago.  Thus, the passage of time along with exemplary behavior and rehabilitation in prison count may be considered under <u>Biggs</u> and <u>Irons</u>.  <u>Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

Though hardly extensive, Supreme Court jurisprudence suggests that judicial review should be extremely deferential to the original decisionmaker in the parole context.  In addition to the very low evidentiary standard that <u>Hill</u> imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision. <u>See</u> <u>Greenholtz v. Inmates of Neb. Penal & Corr. Complex</u>, 442 U.S. 1, 13 (1979).  "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of the actual parole decisionmakers in predicting future behavior.  Our system of federalism encourages this state experimentation."  <u>Id.</u>

**B.**     **Parole for Murderers in California**

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a minimum term of twenty-five years to life and a second degree murder conviction yields a base term of fifteen years to life imprisonment.  <u>See</u> <u>Dannenberg</u>, 34 Cal. 4th at 1078; CAL. PENAL CODE § 190.  The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is so great that parole is a rarity rather than the norm for murderers.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date . . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." CAL. PENAL CODE § 3041(a). Significantly, that statute also provides: The panel shall set a release date,

> unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Id. § 3041(b).

One of the implementing regulations, Title 15 of the California Code of Regulations, section 2401 provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public." The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." CAL. CODE REGS. tit. 15, § 2402(a).

In making its determination, the parole board may consider "[a]ll relevant, reliable information available," including,

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id. § 2402(b).

13

United States District Court

For the Northern District of California

Circumstances tending to show unsuitability for parole include the nature of the commitment offense, and consideration of whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. § 2281(c). This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. See id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. See id. § 2281(d).

The regulations also contain a matrix of suggested base terms that prisoners with indeterminate sentences should serve before they are released on parole. The matrix provides three choices of suggested "base terms" for several categories of crimes. See CAL. CODE REGS. tit. 15, § 2403. If, as in Petitioner's case, the base offense is one count of first-degree murder with the use of a dangerous weapon (firearm), the matrix of base terms ranges from a low of 29-31 years, to a high of 30-32 years, depending on some of the facts of the crime.[2] See id. § 2403(b). Although the

---

[2] One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder. The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire." The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or "torture." Each of the choices are further defined in the matrix. See CAL. CODE REGS. tit. 15, § 2403(b).

matrix is to be used to establish a base term, this occurs only once the prisoner has been found

suitable for parole.  See id. § 2403(a).

The statutory scheme places individual suitability for parole above a prisoner's expectancy in

early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at

1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raise "*public safety*" concerns requiring further indefinite incarceration.  (Italics added.)  Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

Id. at 1070 (emphasis, brackets and parenthesis in original).  Indeed, the very regulation that

includes the matrix states that "[t]he panel shall set a base term for each life prisoner who is found

suitable for parole."  CAL. CODE REGS. tit. 15, § 2403(a) (emphasis added).  "[T]he Board,

exercising its traditional broad discretion, may protect public safety in each discrete case by

considering the dangerous implications of a life-maximum prisoner's crime individually."

Dannenberg, 34 Cal. 4th at 1071 (emphasis added).  The California Supreme Court's determination

of state law is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988);

Sandstrom v. Mont., 442 U.S. 510, 516-17 (1979).

The California Supreme Court has determined that the facts of the crime can alone support a

sentence longer than the statutory minimum even if everything else about the prisoner is laudable.

"While the board must point to factors beyond the minimum elements of the crime for which the

inmate was committed, it need engage in no further comparative analysis before concluding that the

particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."

Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002) ("[t]he

nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might

violate due process "where no circumstances of the offense reasonably could be considered more

aggravated or violent than the minimum necessary to sustain a conviction for that offense"), cert.

denied, 538 U.S. 980 (2003).  The Ninth Circuit has recognized that in some cases, "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes."  Irons, 505 F.3d at 854; see also Biggs, 334 F.3d at 917 n.5.

**C.    Analysis**

**1.    Opportunity to Be Heard and Reasons for Denial**

The first prong of the Biggs test is whether there was a deprivation of a constitutionally protected liberty or property interest.  Having recognized that California inmates still maintain a liberty interest in parole, the Court analyzes the next prong.  The second prong of the Biggs test is whether there was a denial of adequate procedural safeguards.  Under the second prong, the first question pertains to whether Petitioner was given an opportunity to be heard and whether he was given reasons for the parole denial.  See Biggs, 334 F.3d at 913; Sass, 461 F.3d at 1126; Greenholtz, 442 U.S. at 16.

Petitioner fully participated in his 2004 parole suitability hearing, as evidenced by the transcript of that hearing.  (Resp't Ex. 3.)  Throughout the hearing, Petitioner was given the opportunity to make comments and/or objections in response to the BPT's statements, clarify any misunderstandings and provide statements regarding his parole eligibility.  (Id.)  In addition, the BPT laid out detailed reasons for denying Petitioner parole, which are discussed further below.  The Court finds that the BPT satisfied the requirements for due process under this prong.

**2.    "Some Evidence" Standard**

The next question is whether there was some evidence to support the BPT's decision to deny parole.  The Supreme Court has suggested that the "some evidence" standard is extremely deferential to the original decision-maker.  See Hill, 472 U.S. at 454 (examination of the entire record is not required nor is an independent assessment of the credibility of witnesses or weighing of the evidence; the relevant question is whether there is any evidence in the record that could support the conclusion reached by the decision-maker).  Moreover, the Supreme Court's comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's

decision.  See Greenholtz, 442 U.S. at 13 ("No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of the actual parole decisionmakers in predicting future behavior.").

### a.  The 2004 Parole Suitability Hearing

At the 2004 initial parole suitability hearing, the BPT found that Petitioner was "not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  (Resp't Ex. 3 at 67:13-15.)  As mentioned above, the Court construes Petitioner's due process claims to allege that the BPT's 2004 denial violated due process because it was not supported by some evidence.

Before analyzing the merits of his due process claim, the Court notes that Petitioner specifically objects to the BPT having considered the victim's father's recorded testimony made via audio tape, as well as statements made by the victim's next of kin, Martel Moore and Angela Butcher, requesting a finding of unsuitability.  Petitioner argues that the BPT violated California Penal Code §§ 3041.5, 3043.6 and Title 15 of the California Code of Regulations §§ 2247, 2249 when it prevented him from listening to or receiving a transcript of the tape-recorded statement from the victim's father.  (Am. Pet. at 13-17.)  Petitioner further contends the BPT allowed statements at his hearing from the victim's next of kin beyond that permitted under California Penal Code § 3043.2.  (Id. at 18-20.)

Petitioner's objections do not warrant habeas relief.  First, a request for federal habeas corpus relief must be based on a violation of federal law.  28 U.S.C. § 2254(d).  As such, any alleged violations of California's procedural provisions do not raise cognizable federal claims.  See Pulley v. Harris, 465 U.S. 37, 41 (1984) (A state court's evidentiary ruling not subject to federal habeas review unless it violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process).  Second, even if these claims were cognizable on habeas review, they would still fail. Assuming arguendo that the BPT violated these state procedural provisions, Petitioner fails to

establish he was prejudiced by these purported errors because the BPT did not rely exclusively on these statements to deny parole. Instead, as shown below, the state court determined that the BPT relied on other factors as some evidence to deny him parole -- (1) the commitment offense; (2) his psychological report; (3) his unfavorable social history; (4) his prison disciplinary history; and (5) his need for further self-help and program participation.[3]

### (1)  The Commitment Offense

The BPT found some evidence supporting its determination of Petitioner's unsuitability for parole based on a finding that the offense "demonstrates an exceptionally callous disregard for human suffering." (Id. at 68:13-14.) The BPT stated:

> This was the murder of 29-year-old Debra Louise Sefeldeen. She was the wife of the inmate, the mother of his child, and she was murdered according to Mr. Sefeldeen because he believed she was having a lesbian affair. Mr. Sefeldeen apparently was told to vacate their apartment after he and his wife began to have difficulty in their marriage, and he actually went and purchased a rifle. And was noted by the District Attorney, took the rifle back, purchased the rifle again, and went to his wife's place of employment where he waited outside until she exited the building, and without, essentially without any warning and without any discussion opened fire on her and murdered her. This was a really brutal offense, and this was a woman who had a relationship of trust with the inmate. She, once again, was the mother of his child, and she was given absolutely no opportunity to defend herself or to try in any way to make herself safe from him. She was attacked without any warning.

(Id. at 67:17-68:11.)

In deciding whether to issue a four-year denial, the BPT reiterated the violent nature of the crime and other factors:

> . . . the Hearing Panel finds that the prisoner's been convicted of murder, and it's not reasonable to expect that parole would be granted at a hearing during the next four years. The specific reasons for this finding are as follows: First of all, the commitment offense, and once again, this was a very cold-blooded, calculated, brutal offense. And the motive for this crime was one that was apparently created in the mind of the inmate. The prisoner has a history of unstable relationships. He also has recently committed serious disciplinary violations. In 1992, he received a serious 115 disciplinary for disrespect towards staff. Recent psychiatric evaluation dated 9/24/04, authored by Dr. Goldyne . . . indicates a

---

[3] Respondent also alleges that Petitioner cannot now raise these issues in federal court because neither Petitioner nor his attorney objected to the content of the testimony provided by the victim's family members or the manner in which the victim's father's testimony was presented. (Answer at 10.) However, the Court need not address this argument upon finding that Petitioner was not prejudiced by the alleged procedural errors.

18

need for a longer period of observation and evaluation or treatment. And the prisoner has not yet completed essential programming that he needs in order to gain insight and for his adjustment in general and needs to participate more in self-help.

(Id. at 71:15-72:9.)

While the BPT did commend Petitioner for his above average work reports and educational achievements, it exercised its authority under state law to make a finding of unsuitability for parole based on the commitment offense. (Id. at 71:7-12.); see Dannenberg, 34 Cal. 4th at 1071; see also Rosenkrantz, 29 Cal. 4th at 682-83.

### (2) Petitioner's Psychological Report

The BPT also relied on Petitioner's most recent psychological report in support of its decision to find him unsuitable for parole. (Resp't Ex. 3 at 69:10-70:10.) This report was authored by Dr. Goldyne on September 24, 2004. (Am. Pet. Ex. C-3.) Dr. Goldyne noted that Petitioner "[d]id not endorse guilty ideas about his offense and did not spontaneously express compassion or empathy for the plight of his victim. Rather he focused on his own plight as a result of the woman he loves being dead." (Id. at 3.) Dr. Goldyne stated that Petitioner is a "moderate risk" for "violence recidivism" and that Petitioner would benefit from "psychotherapy interventions targeted towards his deficiencies in empathy, his tendency to externalize, and his frequent attribution of malevolence to others." (Id. at 8-9.) Additionally, the BPT noted:

The psychological evaluation dated 9/24/04, by Dr. Goldyne is unfavorable in that it speaks a great deal to the inmate's lack of insight and lack of guilt and lack of remorse for this crime. It also concludes that he's overly suspicious and has a diagnosis of nonspecific personality disorder with paranoid and narcissistic features. It states that his account of his feelings about his wife's death did not refer empathetically to her feelings or to her family's suffering, rather focused on his own suffering and victimization by the situation. When asked what his insight had been into the fact that he killed his wife, he repeatedly focused on factors external to himself. Despite the fact that the doctor repeatedly requested that he consider the rationale of his decision to buy a gun and kill her, he rigidly returned to the issue of having decided to enter a relationship with the victim in the first place. It says that the reviewer confronted him with the fact that his rigid focus on his initial decision to enter the relationship suggested that killing her was a foregone conclusion given the fact that he did in the relationship and it notes that in response he again rigidly returned to the issue of having decided to marry her and remain in America despite his family's admonitions.

(Resp't Ex. 3 at 69:11-70:10.)

### (3) Unfavorable Social History

19

The BPT also considered Petitioner's unfavorable social history in support of its decision to find him unsuitable for parole. According to the BPT, Petitioner's unstable history was indicated by the fact that he was married to two different women within a two-year period. (Id. at 68:20-23.) Additionally, the BPT noted that Petitioner "apparently also was engaged in extra-marital sexual activity if not an affair at the time of the commitment offense." (Id. at 68:23-25.)

### (4)    Prison Disciplinary History

The BPT determined that Petitioner's activities in prison were unfavorable, and this served as another reason to find him unsuitable for parole. Specifically, the BPT found that Petitioner had committed seven serious disciplinary violations (CDC 115's) and received two counseling memoranda (CDC 128's). (Id. at 69:2-10.) Presiding Commissioner Susan Fisher noted:

> [Petitioner]'s also failed to demonstrate evidence of positive change. He has had two 128(a) counseling chronos. The last one was in 1991 for failure to respond to a ducket [sic]. The one prior to that was in 1988 for rights and respects of others. He's had seven 115 disciplinary reports, and I want to note for the record that two of those were for battery on a prisoner. They were both back in '92 and '93, and the most recent one in 2002 was for disrespect to staff.

(Id. at 69:1-10.)

### (5)    Need for Further Self-Help and Program Participation

The BPT found that Petitioner had been "programmed in a limited manner while incarcerated." (Id. at 68:25-26.) The BPT determined that Petitioner "needs self-help and therapy when available in order to face, discuss, and understand his commitment offense and to cope with stress in a nondestructive manner." (Id. at 70:23-71:1.)

Despite examining the factors of suitability that would support parole, i.e., that Petitioner would be deported to Egypt if released and that he was upgrading educationally, the BPT found that these "positive aspects of his behavior do not outweigh the factors of unsuitability." (Id. at 71:13-14.) Moreover, the BPT determined that Petitioner "continues to be an unpredictable . . . and a threat to others." (Id. at 71:2-3.) The BPT noted:

> In view of the prisoner's assaultive history and continued negative behavior and the minimal amount of program participation, there is no indication that he would behave differently if paroled. We would like to commend Mr. Sefeldeen for the work that he's been doing. He's had above average work reports. He's a volunteer tutor for the GED prep classes. He did advance alternatives to violence, and he has received an A this year in Spanish. However, currently, the positive aspects of his behavior do not outweigh the factors of unsuitability.

(Id. at 71:3-14.)

### (6)    Conclusion

As noted supra, the panel identified the fact-specific reasons to support its conclusion that Petitioner was unsuitable for parole. Contrary to Petitioner's arguments, the record shows that the BPT's findings were supported by some evidence. The records show that the BPT conducted a thorough review and consideration of Petitioner's individual factors tending to show unsuitability and suitability for parole. Indeed, the BPT recognized and commended Petitioner's above average work reports and participation in educational programs. Nevertheless, the BPT found that Petitioner was not yet suitable for parole because "the positive aspects of his behavior do not outweigh the factors of unsuitability." (Id. at 71:12-13.)

Having reviewed the facts of the crime as recited by the BPT and the other reasons stated for finding Petitioner unsuitable for parole, the Court finds that there was some evidence in the record to support the BPT's decision. See Hill, 472 U.S. at 455-56.

### b.    Superior Court Denial

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Because the superior court's decision is the last reasoned decision regarding Petitioner's challenge to the BPT's denial of his parole, the Court will review the decision under 28 U.S.C. § 2254(d). See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006). In denying Petitioner's state habeas petition, the Santa Clara Superior Court held that the BPT did not

err in determining Petitioner's unsuitability for parole.  Citing <u>Biggs</u>, the court concluded that there was some evidence allowing the nature of the offense to be used as grounds for the parole denial. Moreover, the court found that "there is 'some evidence' supporting the [BPT's] findings regarding Petitioner's unstable history, his psych report, and his disciplinary 115s from 1992 and 1993." (Resp't Ex. 2 at 1-2.)

Having reviewed the facts of the crime as recited by the BPT, and the other reasons stated for finding Petitioner unsuitable for parole, the Court does not find evidence to support Petitioner's assertion that BPT violated his due process rights.  While the BPT considered the statements by the victim's father's and next of kin, the record reflects that the BPT did not rely exclusively on these statements in its decision to deny parole.  Rather, its decision was supported by some evidence as discussed <u>supra</u>.  The Court concludes that the state court's decision to uphold the BPT's denial of parole was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an unreasonable application of, clearly established federal law, <u>id.</u> § 2254(d)(1).

Accordingly, Petitioner's due process challenge to the denial of parole by the BPT is DENIED.

## IV.    <u>Certificate of Appealability</u>

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability (COA) in its ruling.  <u>See</u> Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).  However, the Ninth Circuit has made clear that a state prisoner challenging the BPT's administrative decision to deny a request for parole need not obtain a certificate of appealability.  <u>See</u> <u>Rosas v. Nielsen</u>, 428 F.3d 1229, 1232 (9th Cir. 2005). Accordingly, any request for a COA is DENIED as unnecessary.

### <u>CONCLUSION</u>

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  In addition,

1  any request for a COA is DENIED as unnecessary. The Clerk of the Court shall enter judgment in

2  accordance with this Order, terminate all pending motions, and close the file.

3          IT IS SO ORDERED.

4  DATED: 2/9/10                                    _____

5                                                   SAUNDRA BROWN ARMSTRONG
                                                    United States District Judge
6

7

8

9

10

11

12

13  UNITED STATES DISTRICT COURT

14  FOR THE

15  NORTHERN DISTRICT OF CALIFORNIA

16

17

18

19  KAMAL A. SEFELDEEN,                        Case Number: CV07-01289 SBA

20          Plaintiff,                         **CERTIFICATE OF SERVICE**

21

22    v.

23  BOARD OF PRISON TERMS et al,

24          Defendant.

25  _____/

26

27  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    Court, Northern District of California.

28

That on February 11, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Kamal A. Sefeldeen #D-65574
California State Prison - San Quentin
San Quentin, CA 94974

Dated: February 11, 2010

Richard W. Wieking, Clerk
By: LISA R CLARK, Deputy Clerk

United States District Court
For the Northern District of California